**J.C.N. CONSTRUCTION, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 12–353C.

United States Court of Federal Claims.

Filed Under Seal: Oct. 29, 2012.

Reissued: Nov. 6, 2012.

506

Robert J. Symon, Bradley Arant Boult Cummings LLP, Washington, D.C., for plaintiff. With him on the briefs was Aron C. Beezley, Bradley Arant Boult Cummings LLP, Washington, D.C.

Courtney S. McNamara, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

This post-award bid protest is before the court on plaintiff's motion for judgment upon

---

1. Because this opinion and order might have contained confidential or proprietary informa-

the administrative record and the government's cross-motion for judgment. Plaintiff, J.C.N. Construction, Inc. ("JCN"), contends that the United States Postal Service ("Postal Service" or the "agency") improperly evaluated proposals in connection with the award of a firm, fixed-price contract for replacement of the heating, ventilation, and air conditioning system ("HVAC system") in the principal post office in Portland, Maine. *See* Mem. in Support of Pl.'s Mot. for Permanent Injunctive Relief, Declaratory Relief and Judgment on the Admin. Record ("Pl.'s Mem.") at 1–2. Specifically, JCN claims that the Postal Service treated offerors unfairly by allowing the chosen offeror, Paul J. Rogan Co., Inc. ("Rogan"), to have inside information concerning the scope and timing of work to be performed, misapplying the solicitation evaluation criteria, and providing an improper advantage to Rogan by breaching its implied duty to consider proposals fairly and honestly in an earlier solicitation for the same work. *See id.*

## FACTS[2]

### A. *The First Solicitation*

In preparing to award a contract to replace the HVAC system at the Postal Service's main office in Portland, Maine, a 250,000–square–foot facility, the agency first solicited bids and proposals for the award on July 1, 2011. *See* AR 1–2.[3] That solici-

tion, No. 082530–11–A–0042 ("Solicitation I"), was issued by its Northeast Facilities Service Office, located in Connecticut. *Id.* Besides detailed design drawings, the solicitation set forth a summary of the scope of work to be performed, including removal of asbestos and the replacement and maintenance of the post office's HVAC system, AR 1–54, as well as a phasing schedule that suggested the order in which the work should be performed, AR 1–699; *see also* AR 1–14 (stating that the offeror could suggest an "'alternate' proposal with a revised performance time, shorter or longer" to the Postal Service). Proposals were due August 2, 2011, AR 1–2, and the contract was to be awarded to "the firm providing the best value based on the combination of qualifications provided in the [firm's required] Qualification Statement and the contractor's cost proposal." AR 1–379. The Qualification Statement consisted of three parts: the contractor's experience, as evidenced by its completion of at least two comparable projects within the previous five years; its bonding capability; and its safety record. AR 1–379 to –83. The solicitation stated that "[o]ffers or modifications of offers received at the address specified for the receipt of offers after the exact time specified for receipt of offers will not be considered unless determined to be in the best interests of the Postal Service." AR 1–12.[4]

---

tion within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information. No redactions were requested.

2. The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions. See *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir. 2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States*, 75 Fed. Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings . . . from the [administrative] record as if it were conducting a trial on the record.'") (quoting *Acevedo v. United States*, 216 Fed.Appx. 977, 979 (Fed.Cir.2007)).

3. "AR ___" refers to the administrative record filed with the court in accord with RCFC 52.1(a). The administrative record has been subdivided into tabs. The first number in a citation to the administrative record refers to a particular tab, and the number after the hyphen refers to the particular page number of the administrative record, *e.g.,* "AR 6–28." The pages of the administrative record are paginated sequentially without regard to the tabs.

4. "Postal Service contracts are not governed by the [Federal Acquisition Regulations set out in 48 C.F.R. Parts 1–99]." *Tip Top Constr., Inc. v. Donahoe*, 695 F.3d 1276, 1281 n. 1 (Fed.Cir. 2012) (citing *In re Appeal of Kirkpatrick*, PSBCA No. 3832, 96–2 B.C.A. (CCH) ¶ 28,599, 1996 WL 590751 (Oct. 11, 1996)). As a consequence, the Postal Service's procurements are not subject to the more stringent timing rules for offers set out in 48 C.F.R. §§ 15.208(b)(1), 52.215–1(c)(3)(ii)(A). *See Geo–Seis Helicopters, Inc. v.*

JCN submitted its bid of $2,624,370 and other required materials, on August 2, 2011. AR 3–811. Rogan submitted its proposal, with a price of $2,683,488 on August 1, 2011. AR 2–758. On August 3, 2011, one day after the solicitation had closed, Rogan, however, submitted via facsimile, a bid adjustment that lowered its price by $60,000—to $2,623,-488—which was $882 less than JCN's bid. AR 8–963 to –64. The Postal Service thereafter awarded the contract ("Contract I") to Rogan, ranking the firm's proposal as the "best value" for the Service. AR 10–985; *see also* AR 11–986.

JCN was notified of the award on September 9, 2011. AR 13–1007. Soon after, it began the process of disputing the award with the Northeast Facilities Service Office, orally and in writing. AR 15–1013; AR 18–1021 to –25. After receiving no ameliorating responses from the contracting officer at that office, on October 7, 2011, JCN lodged an appeal with the Postal Service's supplier disagreement resolution division in Washington, D.C. AR 20–1031 to –35. In the appeal, JCN alleged that Solicitation I was not conducted properly because (1) the agency inadequately "debriefed" JCN after the contract was awarded; (2) the "slight price discrepancy" of $882 between JCN's and Rogan's bids made it likely "that discussions between [the Postal Service] and Rogan [had] occurred subsequent to proposal submission;" (3) the Postal Service conducted an improper evaluation of JCN because it "did not consider all aspects of JCN's technical proposal;" and (4) the Postal Service awarded Rogan the contract even though "JCN believe[d] that Rogan [could not] comply with the requirement to directly perform 12% of the [c]ontract work." AR 20–1033 to –34.

JCN's appeal was sustained on October 19, 2011 by the Postal Service's Supplier Disagreement Resolution Official Trent Ensley, who found that "the evaluation of offers does not appear to have been conducted in accordance with the terms of the solicitation and does not appear to have been properly documented." AR 25–1049. He ordered the Northeast Facilities Service Office to "conduct a new evaluation of all of the offers received in a manner that is consistent with the solicitation's stated evaluation criteria to determine which offer presents the best value to the Postal Service." *Id.*

The Postal Service reevaluated the proposals, *see* AR 26–1050 to –79, and again awarded the contract to Rogan. *See* AR 27–1080; *see also* AR 28–1081. JCN repeated the appeal process. This time, it alleged that (1) officials of the Postal Service had provided JCN's bid price to Rogan, allowing Rogan to underbid JCN by a very slight amount, and (2) the Postal Service did not conduct a proper reevaluation of the proposals. AR 36–1094 to –95. Mr. Ensley again suspended the contract on December 6, 2011, and asked the Northeast Facilities Service Office to inform interested parties—"actual or prospective offerors whose direct economic interests would be affected by the award of, or failure to award, the contract"—of JCN's appeal, but cautioned "not [to] send a copy of the disagreement or any additional material to the interested parties." AR 40–1120. That same day, the Postal Service issued to Rogan a notification of the suspension, providing a communication that made no mention of the details of JCN's allegations. AR 41–1121. Three days later, Rogan sent a letter to Mr. Ensley, commenting that the company "thought it might be appropriate at this time to explain [its] normal procedure for bidding local Postal Service projects that require the bid to be submitted [to the Northeast Facilities Service Office in Connecticut]." AR 42–1126. According to the letter, Rogan customarily provides the Postal Service with a bid package that includes "budget[ed] values," but completes the final bid package "almost always after the bid time . . . [and] then send[s] the face of the bid via fax to the Postal Service with the appropriate add or deduct, if needed, which represents [its] hard bid final price." AR 42–1126 to –27. Rogan added that "[t]he procedure is a one[-]sided exercise" in which it "is not in contact with the Postal Service in any way." AR 42–1127.

On December 13, 2011, Mr. Ensley issued a decision to terminate the first contract, finding that neither Rogan nor JCN submitted "information establishing that they met

*United States,* 77 Fed.Cl. 633, 640 & n. 20 (2007)

(applying the "late is late" rules of the FAR).

the Minimum Company Performance Requirements," thus raising "serious doubts as to whether the evaluation team conducted an effective evaluation, either in the initial evaluation or the reevaluation." AR 43–1130 to – 31. Mr. Ensley did not reach the merits of "JCN's allegation regarding the potential dissemination of its pricing information before the initial award," noting that "JCN presented only limited, circumstantial evidence in support of this allegation." AR 43–1131. He also commented that the Contracting Officer in the Postal Service's Northeast Facilities Service Office "presented evidence[ ] which appeared to refute the allegation ... [and] the awardee's response to JCN's disagreement specifically denied that the awardee had received any information regarding JCN's pricing during the purchasing process, and adequately explained the facts and circumstances surrounding its price proposal." *Id.*

The Postal Service terminated Contract I, effective February 17, 2012. AR 50–1159. The two-month lapse between the termination decision and effective termination date allowed Rogan to perform work to close out the project and return the building to its normal state. *See* AR 50–1160 to –63 (listing construction work that Rogan was to perform that had not been outlined in the original contract).

### B. *The Second Solicitation*

The second solicitation, No. 072382–12–A–0004 ("Solicitation II"), was issued on February 13, 2012, by the Postal Service's Western Facilities Construction Office located in Denver, Colorado, to which the procurement was transferred. AR 52–1166, AR 46–1137. Solicitation II again requested bids to replace and repair the HVAC system in the main Portland post office. AR 52–1243. A pre-proposal meeting and "walk thru" was conducted at the site, which representatives from JCN and Rogan attended. AR 54–1680 to –81. Both companies bid on Solicitation II. JCN's bid was $2,328,780, while Rogan bid $2,133,000. AR 69–2021. The Postal Service awarded the second contract ("Contract II") to Rogan on March 23, 2012. AR 74–2046.1. The award took a somewhat unusual form. The agency did not actually

award a new contract; rather, it modified the existing contract to account for the "work completed prior to the December 2011 suspension, the work completed as a result of the previous Termination for Convenience and the work associated with the new solicitation," resulting in an increase of $358,979.53, for a total contract price of $2,982,467.53. AR 74–2046.1.

JCN filed an agency protest of the Solicitation II award with the Postal Service's Western Facilities Construction Office on April 10, 2012, alleging that the award was improper because (1) Rogan had not demonstrated that it met the requisite criteria, (2) Rogan was ineligible for the award until the allegations of JCN's November 28, 2011 protest of Solicitation I were properly adjudicated, and (3) Rogan had received an unfair advantage and preferential treatment over other offerors. AR 79–2063 to –64. The office denied JCN's protest on April 18, 2012. *See* AR 81–2084 to –87. JCN timely filed an appeal with the Postal Service's Supplier Disagreement Resolution division. *See* AR 83–2127 to –32. That appeal was denied by letter dated May 25, 2012. AR 91–2177 to –82. JCN filed suit in this court on June 4, 2012.

### STANDARDS FOR DECISION

Pursuant to 28 U.S.C. § 1491(b)(4), the court reviews a challenge to an agency's award of a contract using the standards set out in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this [S]ubsection, the courts shall review the agency's decision pursuant to the standards set forth in [S]ection 706 of title 5."). These standards permit the court to set aside an agency's contracting decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), assuming the criteria for equitable relief are satisfied, *see PGBA, LLC v. United States,* 389 F.3d 1219, 1224–28 (Fed.Cir.2004).

This standard of review requires that considerable deference be given to the agency's procurement decision. *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.2000). It "requires a reviewing court to sustain an agency action

evincing rational reasoning and consideration of relevant factors." *Id.* (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). The court must especially defer to the agency's technical evaluations, past performance ratings, and other "minutiae of the procurement process ... which involve discretionary determinations of procurement officials." *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996); *see also Seaborn Health Care, Inc. v. United States,* 101 Fed.Cl. 42, 48 (2011); *Pitney Bowes Gov't Solutions, Inc. v. United States,* 94 Fed.Cl. 1, 6–7 (2010).

■■■ The court may overturn an agency's decision only "if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Centech Grp., Inc. v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir. 2001)). To show that a government decision lacked a rational basis, a protester must show that the agency's contracting officer "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Keeton Corrs., Inc. v. United States,* 59 Fed. Cl. 753, 755 (2004) (quoting *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■■■ Moreover, to prevail in a bid protest, "a protester must show a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999); *see also Bannum,* 404 F.3d at 1351 ("[I]f the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."). To "establish 'significant prejudice' [a protester] must show that there was a 'substantial chance' it would have received the contract award but for the [agency] errors." *Id.* at 1353 (citing *Information Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir. 2003)); *see also Alfa Laval Separation,* 175 F.3d at 1367; *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

### ANALYSIS

JCN's arguments supporting its motion for judgment on the administrative record fall under three main headings. The first two concern only Solicitation II; the third contention also relates back to Solicitation I. First, JCN claims that the Postal Service gave Rogan preferential treatment because Rogan, as the incumbent contractor under Solicitation I, knew that certain details regarding the scope of work and the phasing requirements set out in Solicitation II were inaccurate and overstated the work to be performed under Solicitation II. Pl.'s Mem. at 15–19. In addition, JCN argues that the Postal Service told Rogan it would modify the first contract instead of creating a new one, allowing Rogan to delete insurance and bonding costs from its Solicitation II bid price and thus underbid JCN. Hr'g Tr. 11:1–14:11 (Sept. 20, 2012);[5] *see also* Hr'g Tr. 51:23–52:15. Second, JCN contends that the Postal Service erred in finding that Rogan possessed the requisite experience to meet Solicitation II's evaluation criteria. Pl.'s Mem. at 19–21. Third, JCN asserts that the Postal Service breached its implied duty to consider the proposals fairly and honestly because the Postal Service allowed Rogan to enter a late modification to its bid price for Solicitation I, enabling the company to use a "curious late modification" to underbid JCN by $882, and consequently gain an advantage that carried over into Solicitation II. Pl.'s Mem. at 21–26.

The government has filed a cross-motion for judgment on the administrative record, contending "that the [Postal Service] acted properly in making the award and JCN has

---

**5.** All subsequent references to the transcript of the hearing conducted on September 20, 2012, will omit the hearing date.

failed to establish that the [Postal Service] acted arbitrarily, capriciously[,] or otherwise in violation of any applicable law or regulation in making the award." Def.'s Cross–Mot. for Judgment on the Admin. Record and Opp'n to Pl.'s Mot. for Permanent Injunctive Relief, Declaratory Relief, and Judgment on the Admin. Record ("Def.'s Cross–Mot.") at 1.

### A. Unequal Treatment

At the core of this case are the Postal Service's actions with respect to Solicitation II—both its preparation of the terms of the solicitation and its conformation of Contract I after it awarded the project to Rogan for the second time. JCN argues that the Postal Service omitted important details regarding the scope of work and the phasing requirements in Solicitation II, and that Rogan, as the incumbent contractor, knew of those inaccuracies and used that knowledge unfairly to submit a lower bid. Pl.'s Mem. at 16–17. In addition, JCN argues that the Postal Service's decision to modify Contract I, instead of creating a new contract after Rogan was awarded Solicitation II, allowed Rogan to delete insurance and bonding costs from its Solicitation II bid price and underbid JCN. Hr'g Tr. 11:1–14:11 see also Hr'g Tr. 51:23–52:15. In response, the government contends that JCN waived its unequal-information claims because it failed to object to the terms of Solicitation II prior to the close of bidding. Def.'s Cross–Mot. at 16–21. Alternatively, it argues that JCN's claims fail because the company did not substantiate "bad faith" or provide "hard facts" that would establish Rogan's unequal access to information. Def.'s Cross–Mot. at 21–27.

JCN's claim that Rogan was afforded an unequal bidding advantage can be broken into three aspects in which Rogan may have had superior information that allowed it to lower its proposal price for Solicitation II. First, JCN asserts that work performed by Rogan before Contract I's termination on February 17, 2012 was included in the scope of work of Solicitation II. Pl.'s Mem. at 16–17. Specifically, JCN points to an invoice from Rogan that lists the following categories in which Rogan had completed work on or before January 31, 2012: chilled water piping; temperature control system; registers, grills, and diffusers; and ductwork. AR 53–1642. JCN contends that these were "items of work that [were] required by the contract under Solicitation [II]," Hr'g Tr. 15:1–3, and that it "appear[s] from [the record] that this work was performed" under Solicitation I. Hr'g Tr. 17:7–8. In this respect also, both parties agree that Solicitation II included asbestos abatement work that had been performed under Solicitation I. See Pl.'s Mem. at 17; Def.'s Cross–Mot. at 24; AR 81–2085 to –86 (Letter from Martin Petrey, Contracting Officer, Postal Service, to Steve Bennett, JCN (April 18, 2012) (denying JCN's agency protest but noting that "approximately 80 percent of the asbestos shown in the scope of work [for Solicitation II] has, in fact, already been abated")). Secondly, JCN asserts that the Postal Service permitted Rogan to use a "relaxed phasing schedule," Pl.'s Mem. at 17, but that Solicitation II "said [the work] was phased, that you had to do work [in one area] and you couldn't go to the next location until you finished that work." Hr'g Tr. 21:19–22. According to JCN, this allowed Rogan to "save general conditions costs" such as supplemental heating or cooling, which therefore did not have to be included in Rogan's Solicitation II proposal. See Hr'g Tr. 22:7–8. Thirdly, JCN asserts that Rogan did not have to include the costs of insurance, bonding, and subbonding in its bid for Solicitation II because the government modified Contract I to include Solicitation II's scope of work rather than awarding a new contract. See Hr'g Tr. 13:21–14:6; AR 74–2046.1. As evidence that Rogan knew it need not factor in new bonding and insurance costs, JCN points to an e-mail dated March 23, 2012, from the Postal Service's Contracting Officer to Rogan, which states, "As previously discussed, because your firm held the first contract related to this project, and in order to address some internal [Postal Service] accounting issues, the determination has been made that we will modify your existing contract ... and not issue a new contract number." AR 74–2046.1 (emphasis added); see also Hr'g Tr. 52:8–15.

1. *Waiver.*

The government contends JCN waived its claim associated with inaccuracies in Solicitation II because it did not identify and raise these inaccuracies with the Postal Service before the close of bidding. Def.'s Cross–Mot. at 16. The government argues that Solicitation II "patently did not contain specific information about all the work that was previously performed by Rogan." *Id.* at 19. The government also asserts that JCN specifically waived its claim regarding the inaccurate scope of work for asbestos abatement because JCN attended a pre-proposal meeting and "asked no questions about the asbestos requirement and raised no issue with respect to the disparity between the site conditions and the solicitation." *Id.* at 20–21. JCN responds that it was diligent in addressing the scope of work in Solicitation II, having submitted clarification requests to the Postal Service prior to submitting a proposal in response to that solicitation. See Pl.'s Reply Brief in Support of its Mot. for Judgment on the Admin. Record and Opp'n to Def.'s Cross–Mot. for Judgment on the Admin. Record ("Pl.'s Reply") at 8 n.6. Correlatively, JCN indicates that it examined the drawings that were part of the solicitation and participated in the walk-through prior to making its proposal. Hr'g Tr. 52:23 to 53:8. JCN argues that "the fact that 120 feet of chilled water pipe may be installed somewhere and already covered, there would have been no way to tell that that work was done." Hr'g Tr. 53:8–11.

In addressing whether Solicitation II contained inaccuracies that were patent or latent, this court applies standard rules of contract interpretation. *See Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1353 n. 4 (Fed.Cir.2004); *Guzar Mirbachakot Transp. v. United States,* 104 Fed.Cl. 53, 64 (2012). "When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity." *Metric Constructors, Inc. v. National Aeronautics & Space Admin.,* 169 F.3d 747, 751 (Fed.Cir.1999). If the court determines that an ambiguity exists, it must then determine whether the ambiguity is patent or latent. *Id.*

A latent ambiguity "is not apparent on the face of the solicitation and is not discoverable through reasonable or customary care." *Guzar Mirbachakot Transp.,* 104 Fed.Cl. at 65. A patent ambiguity is "present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1381 (Fed.Cir.2000). Subtle inconsistencies do not put a reasonable contractor on notice; rather, a patent ambiguity is one that is " 'obvious, gross, [or] glaring.' " *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir.1996) (alteration in original) (quoting *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 716, 499 F.2d 660 (1974)); *see also Guzar Mirbachakot Transp.,* 104 Fed.Cl. at 65. If the ambiguity is patent, a "government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation.' " *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308, 1313 (Fed.Cir.2007) (quoting *Stratos Mobile Networks,* 213 F.3d at 1381). In other words, "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest." *Id.*

In this instance, the government's waiver argument is without merit. Before the close of Solicitation II, JCN did not have access to any of the documents indicating specific work Rogan had performed work under Contract I. *See* Hr'g Tr. 25:16–26:17. Solicitation II did not contain any obvious discrepancies or ambiguities regarding the work to be performed. Contrary to the government's suggestion, *Blue & Gold* does not require offerors to second guess the plain language of a solicitation and inquire about the veracity or accuracy of every assertion set out in a solicitation.

Regarding phasing, the government nonetheless argues that a patent ambiguity does exist in the text of Solicitation II. Def.'s Cross–Mot. at 18–19. In support of this

position, it points to several sections of text within Solicitation II. First, the solicitation says that "[c]ontractors may also submit an 'alternate' proposal with a revised performance time, shorter or longer, with associated costs. The [Postal Service] may negotiate changes to any alternate proposals and may accept if determined to be in the best interest of the Postal Service or reject." AR 52–1178. Second, the summary of work states that "[t]he Contractor shall phase and coordinate his work with the [Postal Service] to minimize the disruption to the facility's normal operation." AR 52–1268. Third, the summary states "[t]here will be no work [performed] at the facility between the dates of November 15 and January 5." *Id.* The government argues that this language patently conflicts with the phasing plan set forth in the Solicitation II drawings that is split into six-week increments, a strict reading of which would require work to continue until November 24. Def.'s Cross–Mot. at 19.

Again, the administrative record negates the government's contention that a patent ambiguity existed in Solicitation II. The inconsistencies in describing the phasing requirements are not gross, glaring, or obvious, such that a reasonable offeror would identify them and inquire about the inconsistency. The only actual conflict to which the government points concerns the work schedule that runs into the third week of November 2012, and the provision that prohibits work from November 15 to January 5. However, the schedule itself does not mention November. Determining that the plan would require work through November 24 requires a contractor to infer dates that are not apparent on the face of the solicitation. The resulting latent ambiguity did not require JCN to raise it before the close of Solicitation II. There is no waiver.

> 2. *Unequal treatment because of inaccuracies in the terms of Solicitation II and the modification of Contract I.*

At the core of this case is the question whether the inaccuracies regarding the scope of work and the phasing requirements, along with the modification of Contract I that allowed Rogan to use its previous bonding and insurance payments, amounted to unequal treatment of offerors that was arbitrary, capricious, or an abuse of discretion.

It is well-established that a "contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of Am., Inc. v. United States,* 56 Fed.Cl. 377, 383 (2003), *aff'd,* 365 F.3d 1345 (Fed.Cir.2004); *see also Afghan Am. Army Servs. Corp. v. United States,* 106 Fed.Cl. 714, 729 (Fed.Cl.2012). "[U]neven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." *PGBA, LLC v. United States,* 60 Fed.Cl. 196, 207 (2004), *aff'd,* 389 F.3d 1219 (Fed.Cir.2004); *see also Gentex Corp. v. United States,* 58 Fed.Cl. 634, 653 (2003) ("The lack of clarity in the RFP, the discussions which suggested that Scott, but not Gentex, consider a CAIV tradeoff in connection with batteries, and the Air Force's failure to correct Gentex's differing understanding of the evaluation scheme of the RFP combined to render this procurement unfair."); *TLT Constr. Corp. v. United States,* 50 Fed.Cl. 212, 216 (2001) ("A fundamental principle of government procurement is that [the agency] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation.").

A lack of clarity in Solicitation II about the scope of work engendered such "uneven treatment" here. Solicitation II was markedly imprecise about the scope of work left to be performed. It appeared to reflect only small changes in the scope of work from Solicitation I. Neither the statement of work nor the attendant drawings disclosed the work previously performed by Rogan on chilled water piping; the temperature control system; registers, grills, and diffusers; and ductwork. Solicitation II also contained an error regarding the scope of asbestos abatement; in fact, as the Postal Service concluded, eighty percent of the work mentioned in the solicitation had already been completed by Rogan. Rogan, as the Contract I awardee, had specific and accurate information about the actual scope of work that needed to

**514**

be performed under Solicitation II and could craft a bid that omitted the cost of extraneous work. Thus, the scope of work of Solicitation II contained inaccuracies that caused the Postal Service to treat the bids of Rogan and the other offerors unequally, an abuse of the agency's discretion.

Respecting the insurance and bonding costs, an e-mail in the record alludes to prior discussions between the agency and Rogan about a modification of Contract I to include Solicitation II's work. That e-mail was sent more than two weeks after the Postal Service decided to award Solicitation II to Rogan and more than three weeks after Rogan submitted its bid. *See* AR 74–2046.1 (E-mail from Petrey to Rogan). Thus, the e-mail, without more, does not conclusively show that the Postal Service informed Rogan about the possibility of modifying the earlier contract before Rogan submitted its offer in response to Solicitation II. Nonetheless, although Rogan provided insurance and bonding under Contract I, it was reimbursed by the government for most of the insurance and bonding costs via the first payment application under that contract. Hr'g Tr. 12:11 to 13:7. When the contact was not terminated, but rather modified by the second award to Rogan, Rogan was not required to give a credit as it would have under a termination for convenience of Contract I. Hr'g Tr. 13:13 to 14:11. As a result, Rogan retained a benefit under Contract I that gave it a price advantage in bidding for Solicitation II.

 Regarding the phasing requirements, however, the evidence to which JCN points to show uneven treatment is simply too scant to support JCN's claim. Nothing in the record demonstrates that the Postal Service knew its language concerning the phasing plan was ambiguous, and the Postal Service had no reason to question JCN's submittal of a proposal that followed the suggested phasing schedule.

### B. *Past Performance*

JCN's second claim is that the agency erred in finding that Rogan's past experience met the requirements set forth in Solicitation II, because Rogan submitted projects smaller in size than the Postal Services's project for a 250,000–square–foot facility. Pl.'s Mem. at 20. Solicitation II asked companies to submit records of "[c]ompletion of a minimum of two (2) comparable projects within the past five (5) years ... [which are of] similar size, cost, type[,] and complexity" as the HVAC system project. AR 52–1243. JCN contends that by accepting Rogan's submissions, the agency "misevaluated Rogan's experience." Pl.'s Mem. at 20. The government counters that "JCN's argument amounts to nothing more than a disagreement with the agency's determination of what constitutes a relevant project for the purposes of evaluation [of] past performance." Def.'s Cross–Mot. at 29.

 JCN's challenge to the Postal Service's evaluation of past performance focuses on the fact that it submitted past performance information on projects that were all larger than any of the completed projects submitted by Rogan. This claim nonetheless is a difficult one to establish. An agency's technical rankings and other "minutiae of the procurement process ... involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.*, 77 F.3d at 449. Moreover, a challenger to an agency's determination of what constitutes comparable past experience "fights an uphill battle against the well-established principle that 'what does or does not constitute "relevant" past performance falls within the [source selection authority]'s considered discretion.'" *Vanguard Recovery Assistance v. United States*, 101 Fed.Cl. 765, 785 (2011) (alteration in original) (quoting *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010)). Challengers "must do more than point out mere 'mistakes' or 'missteps;' they must 'show that the claimed misstep was so excessive as to fall outside the decision-maker's ambit of discretion.'" *Antarctic Support Assocs. v. United States*, 46 Fed.Cl. 145, 155 (2000) (quoting *Cubic Def. Sys., Inc., v. United States*, 45 Fed.Cl. 450, 457–58 (1999)).

 The Postal Service had wide latitude to determine what types of projects it deemed comparable to the HVAC systems project. It awarded points, up to 30 for each project, based on the project's location, size,

completion date, building type, contract type, the difference between the original and final price of the contract, the original and final contract duration, and any awards received. *See, e.g.,* AR 66–1928. It then took each offeror's two highest scores and totaled them, meaning 60 points was the highest score an offeror could obtain for the Service's evaluation of past performance. *See* AR 66–1930. Four evaluators scored the submissions. *See generally* AR 65–1893 to 68–2020. JCN and Rogan scored 57 and 58 points, respectively. AR 66–1930; AR 66–1938.

A review of the record demonstrates that JCN submitted six projects, five of which were 100,000 square feet or larger in size, and one of which totaled 60,000 square feet. AR 66–1927 to –30. Three projects received awards, such as achievement of Leadership in Energy and Environmental Design ("LEED") "Gold" or "Silver" Status. *Id.* Rogan also submitted six projects, all of which were smaller. Five of Rogan's projects ranged from 36,000 to 53,800 square feet, with the sixth totaling 10,000 square feet. AR 66–1935 to –38. For two of those projects, the building's owner awarded a "100%" rating. *Id.* The evaluators varied in their generosity in awarding points to each company, but each ranked JCN and Rogan within at least two points of the other.[6]

 If this court had evaluated the offerors' past experience, it would have graded them differently; however, the "role of the court is 'not to substitute its judgment for that of the agency,' but rather to determine whether the agency had a rational basis for its decision." *Vanguard Recovery Assistance,* 101 Fed.Cl. at 785 (citing *Alabama Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1376 (Fed.Cir.2009)). It was rational for four separate evaluators, all experienced in their field, to conclude in an instance where neither of the offerors had completed a project in a building as large as the 250,000–square–foot post office, that differences in the square footages of the projects submitted did not greatly detract from the ability of either offeror to perform the solicited work. The court will not second

guess these decisions, and cannot say that the Postal Service's evaluation of past performance was arbitrary and capricious.

### C. *The Aftereffects of the Postal Service's Acceptance of Rogan's Late Bid Modification Under Solicitation I*

Finally, JCN claims that the Postal Service did not eradicate its breach of the implied duty to consider offerors' proposals fairly and honestly in response to Solicitation I. JCN avers that the Postal Service had improperly disclosed JCN's bid price to Rogan, allowing Rogan to decrease its bid price by $60,000 to just $882 below JCN's price, and accepted this late modification of price even though it was made one day after the proposal submission deadline. Pl.'s Mem. at 23–24. In turn, "[this] improper award of Contract I to Rogan gave Rogan an unfair competitive advantage when it came to bidding on Solicitation II because Rogan's performance under Contract I gave it accurate information about the de-scoped work that was not reflected in Solicitation II and the [Postal Service's] relaxed phasing schedule." *Id.* The government contends that, as a legal matter, the court does not possess jurisdiction to consider any claims that it breached an implied duty. Def.'s Cross–Mot. at 30–32. Alternately, if the court has jurisdiction, the government argues that (1) JCN has waived the claim because it should have been raised prior to the close of bidding on the second solicitation, and (2) JCN has failed to demonstrate any events connected to Solicitation I caused it to suffer prejudice in the Solicitation II process. *Id.* at 33–34.

1. *Ability to consider a claim for breach of an implied duty of good faith and fair dealing in a bid protest.*

The government argues that the "implied-in-fact contract of fair and honest consideration under 28 U.S.C. § 1491(a) did not survive the passage of the Administrative Dispute Resolution Act ( [']ADRA['] ) for cases in which Section 1491(b) jurisdiction exists." Def.'s Cross–Mot. at 30. To support this contention, the government relies upon the

---

**6.** For example, one evaluator awarded 57 points to JCN and 58 points to Rogan. AR 66–1930;

AR 66–1938. Another awarded 59 points to JCN and 57 to Rogan. AR 68–2010; AR 68–2018.

Federal Circuit's decision in *Resource Conservation Group, LLC v. United States*, 597 F.3d 1238 (Fed.Cir.2010), which held that this court's implied-in-fact jurisdiction over *non*-procurement bid protest cases survived the enactment of the ADRA in 1996.

▮▮▮▮ As the government itself recognizes, its contention directly conflicts with this court's decision in *Castle–Rose, Inc. v. United States*, 99 Fed.Cl. 517, 531 (2011), which held that a protester can bring a claim for violation of the implied covenant of good faith and fair dealing in a bid protest being heard under 28 U.S.C. § 1491(b). *See* Def.'s Cross–Mot. at 31, n. 7. As the court reasoned in *Castle–Rose*,

> *Resource Conservation* indeed stated, "Congress intended the [Section] 1491(b)(1) jurisdiction to be exclusive where [Section] 1491(b)(1) provided a remedy (in procurement cases)." The court interprets this language to state that a protester can bring a claim for violation of the implied covenant of good faith and fair dealing; the jurisdiction for bringing the claim arises under Section 1491(b), not Section 1491(a). Accordingly, [protester] has stated a viable claim.

*Castle–Rose, Inc.*, 99 Fed.Cl. at 531 (citations omitted). A recent decision by the Federal Circuit supports this rationale. *See Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374 (Fed.Cir.2012). In *Systems Application*, the court of appeals cited approvingly its earlier decision in *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed.Cir.1983) (en banc), for the proposition that "there is an implied contract that the procurement process will be conducted fairly and honestly." *Systems Application*, 691 F.3d at 1382–83; *see also Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998) (a post-ADRA case, referring to an unsuccessful bidder's reliance on "the implied-in-fact contract to consider all bids fairly and honestly") (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203 (Ct.Cl. 1974)). The court accordingly finds no reason to abandon its interpretation of *Resource Conservation*. Protesters may bring claims for breach of an implied covenant of fair and honest consideration, and the court has juris-

diction to hear such claims under 28 U.S.C. § 1491(b). Thus, JCN has stated a jurisdictionally appropriate claim.

### 2. *Waiver.*

The government cites a single case to support its proposition that JCN has waived its claim, arguing that "by holding its fire until after the contract was awarded to its competitor, [plaintiff] waived its opportunity to raise issues concerning [the incumbent awardee's] prior performance of the enjoined contract." Def.'s Cross–Mot. at 33 (quoting *CRAssociates, Inc. v. United States*, 102 Fed.Cl. 698, 713 (2011)). The government has disingenuously taken this quote out of context. *CRAssociates* concerned an offeror who failed to raise "objections to the terms of a solicitation." 102 Fed.Cl. at 712. In that case, an offeror had asked the government agency to amend its solicitation to address two concerns arising from another offeror's prior performance of an enjoined contract. *Id.* When the government ignored the offeror's concerns, the offeror took no action, "acting only after the second contract was awarded to [a competing company]." *Id.* The court held that the offeror could not argue "after the award ... that the agency erred in failing to amend the [solicitation] to deal with the concerns" because it "failed to assert [problems with the solicitation], via protest, prior to the award." *Id.*

▮▮▮▮ Unlike the offeror in *CRAssociates*, who had specific concerns about the terms of a second solicitation, JCN's claim that the Postal Service breached its duty to consider offerors' proposals fairly and honestly does not relate to patently inaccurate terms of Solicitation II. Rather, JCN argues that the agency's actions in connection with Solicitation I gave Rogan the ability to look past mistakes in Solicitation II and craft a proper bid—mistakes that were not apparent on the face of Solicitation II, giving JCN no reason to request amendments. The court concurs that there was no reason for JCN to raise the issue before the award of Solicitation II. Consequently, the government's argument based on *CRAssociates* is not well founded, and JCN has not waived its claim.

3. *The earlier acceptance by the Postal Service of a bid modification after the published proposal submission due date.*

 "The ultimate standard for determining whether an unsuccessful bidder is entitled to relief on the ground that the government breached the implied-in-fact contract to consider all bids fairly and honestly is whether the government's conduct was arbitrary and capricious." *Southfork Systems,* 141 F.3d at 1132 (citing *Keco Indus.,* 492 F.2d at 1203). Four additional factors are "generally relevant to the determination of whether the government has breached its duty[, including] ... (1) subjective bad faith on the part of the government; (2) absence of a reasonable basis for the administrative decision; (3) the amount of discretion afforded to the procurement officials by applicable statutes and regulation; and (4) proven violations of pertinent statutes or regulations." *Id.* However, "there is no requirement or implication in *Keco Industries* that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir. 1988).

It is undisputed that the Postal Service allowed Rogan to lower its proposed price for Solicitation I one day after bidding closed. AR 8–963 to –64. The record shows that Rogan originally submitted a proposed price of $2,683,488 on August 1, 2011, AR 2–758, but the Postal Service accepted a modification of that bid (a price decrease of $60,000) on August 3, 2011, after the close of bidding. *See* AR 8–963 to –64. The acceptance of the late modification allowed Rogan to underbid JCN by a mere $882. *Compare* AR 3–811 *with* AR 8–963 to –64.

Furthermore, Solicitation I stated that "[o]ffers or modifications of offers received at the address specified for the receipt of offers after the exact time specified for receipt of offers will not be considered unless determined to be in the best interests of the Postal Service." AR 1–12. The Postal Service explained that it "will accept adjustments in price proposals via fax or e[-]mail" if it is in its best interest to do so, and that

for Solicitation I, it accepted two "faxed adjustments, which [were] placed in a folder with submitted sealed proposals." AR 36–1097.

 JCN contends that the Postal Service engaged in an "apparent improper disclosure of JCN's pricing information to Rogan[,] ... secur[ed] Rogan's award of the initial contract[, ... and] gave Rogan an unfair competitive advantage when it came to bidding on Solicitation II." Pl.'s Mem. at 24. While the timing of Rogan's late submission and the proximity of its modified bid to JCN's price certainly raises very substantial questions, JCN's concerns about the procurement process were at least in part overtaken by the Postal Service's subsequent suspension and initial cancellation of Contract I, coupled with transfer of the management of the procurement to its Colorado office. That the decision to terminate Contract I and issue Solicitation II was purportedly made to rectify improper evaluation of offerors' past experience does not change the analysis. The Postal Service's issuance of a new solicitation and its transfer of the solicitation evaluation process to a different office offered the prospect of curing any unfair behavior on the part of Postal Service officials and Rogan or dishonest evaluation of offerors that may have occurred during Solicitation I.

### D. *Prejudice and Relief*

 The Postal Service's overstatement of the scope of work in Solicitation II and inappropriate handling of insurance and bonding costs amounted to arbitrary and capricious conduct on behalf of the Postal Service. This finding does not end the inquiry, however. "Not every error by a [contracting officer] justifies overturning an award." *CRAssociates, Inc. v. United States,* 95 Fed. Cl. 357, 389 (2010) (alteration in original) (quoting *United Int'l Investigative Servs., Inc. v. United States,* 42 Fed.Cl. 73, 87 (1998), *aff'd,* 194 F.3d 1335 (Fed.Cir.1999)). Rather, "[t]o prevail in a bid protest, a disappointed offeror must show both significant error in the procurement process and prejudice to its posture in the process." *PGBA, LLC v. United States,* 60 Fed.Cl. at 203 (citing *Advanced Data Concepts, Inc. v.*

*United States,* 216 F.3d at 1057). To establish prejudice, "a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." *Banknote,* 365 F.3d at 1351.

■ The question, then, is whether JCN has shown that it had a substantial chance of winning Solicitation II but for the inaccuracies in Solicitation II's scope of work and the inappropriate handling of insurance and bonding requirements. Rogan's winning proposal was $2,133,000, AR 74–2046.1, while JCN bid $2,328,780. AR 69–2021. Thus, Rogan's and JCN's bids were close to each other, and both were technically qualified for the work.

Combining the value of the concededly incorrect scope of asbestos abatement with the HVAC work Rogan performed under Contract I that was nonetheless included in Solicitation II produces a total value of $169,898.[7] By taking account of insurance and bonding costs, JCN's bid would be lower than Rogan's bid. Thus, JCN has shown that it would have had a substantial prospect of receiving the award of the contract had the Postal Service properly conducted the second solicitation. In short, JCN has shown that it was prejudiced by the Postal Service's errors in the procurement.

■ Despite this finding of prejudice, equitable relief is not appropriate in this case. At the hearing conducted on September 20, 2012, Mr. Andrew Stein, the Postal Service's architect-engineer acting as the contracting officer's representative respecting the HVAC project, testified that at that time work on the contract was 93 percent finished. Hr'g Tr. 58:22–23. Only two main items remained to be completed: (1) addressing a punch list of corrective matters, and (2)

balancing the system. Hr'g Tr. 59:9 to 60:24. Considering the four factors that govern equitable relief,[8] it is apparent that an injunction would be of little utility, given the near completion of the work covered by the contested procurement award. "This court has recognized that 'when a contract has been substantially completed, it is impossible, or at least imprudent, for the court to order that the contract be rebid.'" *Furniture by Thurston v. United States,* 103 Fed.Cl. 505, 521 (2012) (quoting *Forestry Surveys & Data v. United States,* 44 Fed.Cl. 485, 491 (1999)).

JCN is not without any remedy. Because it has prevailed on the merits of its protest, it is entitled to an award of bid preparation and proposal costs pursuant to 28 U.S.C. § 1491(b)(2). *See Furniture by Thurston,* 103 Fed.Cl. at 522 (citing *PGBA,* 60 Fed.Cl. at 222).

## CONCLUSION

For the reasons stated, the plaintiff's motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART, and the government's cross-motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART. No injunctive relief will issue, but JCN shall recover its reasonable bid preparation and proposal costs.

JCN shall submit a reckoning of such costs on or before November 16, 2012. The government shall respond to JCN's submission of such costs by November 30, 2012.

It is so **ORDERED.**

---

7. This work includes costs related to chilled water piping; the temperature control system; registers, grills, and diffusers; and ductwork. The record shows the following completed work and associated costs in those areas for the work period through January 31, 2012, when Rogan was performing work under Contract I:(1) Chilled Water Piping: $59,160 (work completed before the period) + $18,044 = $77,204; (2) Temperature Control System: $13,473; and (3) RGDs (Registers, Grills and Diffusers) plus Ductwork = $40,401.00. *See* AR 53–1642.

8. In deciding whether to issue a permanent injunction, the court must consider four factors: (1) whether the plaintiff has succeeded on the merits of its case, (2) whether the plaintiff will suffer irreparable harm absent injunctive relief, (3) whether such harm would outweigh the harm of the government, and (4) whether an injunction would serve the public interest. *See PGBA,* 389 F.3d at 1228–29.